# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
February 5, 2014 Session

## KATHY AUSTIN, ET AL. v. JACOB WILDS, JR., ET AL.

**Appeal from the Chancery Court for Greene County**
**No. 20100174      Jon Kerry Blackwood, Senior Judge**

---

### No. E2013-01310-COA-R3-CV - Filed April 22, 2014

---

Kathy Austin, Vickie Shipley, and Sherry Foshie ("Plaintiffs") sued their brothers, Jacob Wilds, Jr. and James Wilds ("Defendants"), seeking to have certain deeds from their mother set aside due to alleged undue influence and/or duress. After a bench trial, the Chancery Court for Greene County ("Trial Court") entered its order rendering judgment in favor of Defendants after finding and holding, *inter alia*, that Plaintiffs had failed to prove the existence of a confidential relationship necessary to show that the subject deeds were procured through undue influence. Plaintiffs appeal. We find and hold that the evidence does not preponderate against the Trial Court's findings, and we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and JOHN W. MCCLARTY, J., joined.

Thomas C. Jessee, Johnson City, Tennessee, for the appellants, Kathy Austin, Vickie Shipley, and Sherry Foshie.

Ben W. Hooper, III, Newport, Tennessee, for the appellees, Jacob Wilds, Jr. and James Wilds.

**OPINION**

**Background**

Plaintiffs and Defendants are adult siblings and the children of Dixie Wilds, who died in late 2009. By virtue of the Last Will and Testament of Dixie Wilds, Plaintiffs inherited an interest in a tract of land of approximately .85 acres[1] in Greene County, Tennessee[2], which included the house where Dixie Wilds had lived at the time of her death. At some point in time after the death of Dixie Wilds, Plaintiffs discovered that there was an issue regarding the water rights to the house they had inherited from Dixie Wilds. Plaintiffs sued Defendants alleging that deeds executed by Dixie Wilds and Defendants on September 28, 2000 were procured through undue influence and/or duress and seeking to have these deeds reformed as to the water rights. The case was tried without a jury in June of 2012.

Attorney D.R. Beeson, III testified at trial about his title examination of the deeds involved in this case. Attorney Beeson testified that the real property at issue in this case was originally one tract of land consisting of approximately 150 acres ("150 Acres"). In 1949 Tom Hale and his wife deeded the 150 Acres to the Wilds brothers, Virgil, Jacob, and Jerry, as tenants in common. Jacob Wilds was the husband of Dixie Wilds and the father of Plaintiffs and Defendants. Dixie Wilds received no interest in the 150 Acres by virtue of the 1949 deed. Jacob Wilds and Dixie Wilds lived in a house on the 150 Acres.

In 1962, Virgil Wilds deeded his one-third undivided interest in the 150 Acres to Jacob Wilds and Dixie Wilds. In 1963 Jerry Wilds deeded his one-third undivided interest in the 150 Acres to Jacob Wilds and Dixie Wilds. The 1962 and 1963 deeds created a tenancy by the entireties in Jacob Wilds and Dixie Wilds in two-thirds interest in the 150 Acres. The one-third undivided interest held by Jacob Wilds by virtue of the 1949 deed from Tom Hale and his wife continued to be held solely by Jacob Wilds.

---

[1] The record reveals some discrepancy in the stated acreage of the tracts of real property involved in this case. As is often the case, later surveys disagree with the amounts of acreage stated in deeds that appear earlier in the relevant chain of title. There is no dispute in this case regarding the amount of acreage involved in the real property at issue. As such, for ease of reference and to avoid confusion and maintain consistency in the areas being discussed, we refer in this Opinion to the acreage using the approximations that appear in earlier deeds within the chain of title introduced at trial.

[2] As best as we can tell from the record on appeal, some of the real property owned by Jacob Wilds and Dixie Wilds may have been located in Cocke County and some in Greene County. The exact location of the real property is not material to the issues raised in this appeal.

In January of 1964 Jacob Wilds and Dixie Wilds created a life estate for Winnie Wilds, the mother of Jacob Wilds, in .4 of an acre of the 150 Acres. Then, in 1975 Jacob Wilds and Dixie Wilds conveyed the 150 Acres to Defendants with three exceptions, the .4 acre life estate for Winnie Wilds, a one acre tract, and a .6 acre tract. The one acre tract and the .6 acre tract were treated as one tract, and Jacob Wilds and Dixie Wilds had their house on the 1.6 acres. The 1975 deed also retained a life estate for Jacob Wilds and Dixie Wilds in the 150 Acres less the exceptions. Upon the death of Jacob Wilds, the 1.6 acre tract passed to Dixie Wilds as the surviving tenant by the entireties. As for the .4 acre tract, Dixie Wilds owned a two-thirds undivided interest as the surviving tenant by the entireties, and the remaining one-third interest was shared by Dixie Wilds and her five children, who are the Plaintiffs and Defendants.

The specific deeds which Plaintiffs allege were the product of undue influence and/or duress were executed on September 28, 2000, after the death of Jacob Wilds. On that day defendant Jacob Wilds, Jr.[3] and Dixie Wilds conveyed to defendant James Wilds approximately 88 acres, which included their interests in the 1.6 acres and the .4 acres. Defendant James Wilds and Dixie Wilds also conveyed to defendant Jacob Wilds, Jr. a portion of the 150 Acres in order for Dixie Wilds to relinquish her life estate created in the 1975 deed to Defendants. Also on September 28, 2000, defendant James Wilds conveyed to Dixie Wilds .85 acres, which was a portion of the 1.6 acres. The September 28, 2000 deed from James Wilds to Dixie Wilds contained a right to use and maintain a spring, pump house, and existing water lines located on other property of James Wilds and stated that the grant of water rights was personal and not to run with the land. Prior to execution of the September 28, 2000 deeds, Dixie Wilds owned a life estate in the 150 Acres less the above mentioned exceptions, owned 1.6 acres, and owned an interest in the .4 acres. Basically, on September 28, 2000 Dixie Wilds conveyed all her interests in the property to Defendants and then defendant James Wilds conveyed .85 acres back to Dixie Wilds.

Defendant James Wilds testified at trial that he is retired from the Greeneville City School System. James Wilds testified about the day that the September 28, 2000 deeds were executed. He stated that he received a call at the school and was asked to come to Attorney Greer's office to sign some deeds with regard to the property he and his brother owned in common, which they were dividing. His brother and his mother were at Attorney Greer's office when he arrived. James Wilds was asked if his mother was competent when they were in Attorney Greer's office, and he stated: "Very competent." He testified that he had a good relationship with his mother at that time. James Wilds testified that he cut water off to the property inherited by his sisters some time after his mother's funeral.

---

[3]Because the Defendants share the same last name, when we refer to them individually in this Opinion we refer to them using both first and last name to avoid confusion.

Defendant Jacob Wilds, Jr. testified that he had no discussions with Attorney Greer or with his mother about water to his mother's home. He testified that he took his mother to Attorney Greer's office on September 28, 2000. Jacob Wilds, Jr. explained that he was having coffee with his mother earlier that day and when he mentioned that he was going to Attorney Greer's office his mother asked if she could go with him. Jacob Wilds, Jr. testified that at that time he had a good relationship with his mother.

Jacob Wilds, Jr., testified that he first became aware that Attorney Greer was preparing a Last Will and Testament for his mother on September 28, 2000. He testified that his mother was managing her own affairs and was capable of doing so at that time.

Plaintiff Kathy Austin testified that she is a homemaker and on the Greene County Board of Education. Ms. Austin testified that during her mother's lifetime there never was a time during which there was no water to her mother's property. Ms. Austin first found out that there was an issue about the water when she spoke with Defendants a few days after their mother had died.

Ms. Austin was asked what she did to assist her mother prior to 2000, and she stated:

Well, I took her to town. We would go eat. You know, sometimes she would go to doctors' appointments by herself. Sometimes I would take her. We'd stop by the bank, and she'd cash, you know, her checks or whatever. So just general things like that. Then she could still drive.

Ms. Austin was asked if her claim of undue influence or duress in this case was based on the fact that her brother drove their mother to Attorney Greer's office on September 28, 2000 and the fact that her mother trusted her brother, and Ms. Austin agreed. She was asked if her mother was capable of managing her own affairs at the time the September 28, 2000 deeds were made, and Ms. Austin stated: "She was competent to do daily affairs, yes." When asked if she had any knowledge of any threat or coercion imposed upon her mother by her brother, Ms. Austin stated: "Not other than the paperwork." Ms. Austin was asked upon what she based her claim that her brother James had exercised undue influence over their mother, and she stated: "She trusted him and paperwork." Ms. Austin admitted that her mother also trusted Ms. Austin and her sisters.

Ms. Austin testified that to her knowledge her mother never gave anyone a power of attorney prior to September of 2000. Ms. Austin admitted that her mother also executed her Last Will and Testament on September 28, 2000 and agreed that she was not questioning the validity of her mother's Last Will and Testament.

-4-

Ms. Austin admitted that public water is available to the property she and her sisters inherited from their mother for a $1,300 tap fee, but stated that they have not hooked into the public water. She testified that when they stay at her late mother's house they carry jugs of water.

Plaintiff Sherry Foshie testified that she is a teacher retired from the Greene County School System. Ms. Foshie was asked what the relationship between her mother and her brothers and sisters was like between the time of her father's death in July of 2000 and September 28, 2000, and she stated: "Just a normal family. . . . We got together at Christmas time. We got together on Mother's Day, Father's Day, ran in to each other when we were visiting our parents."

Plaintiff Vickie Shipley testified that she is employed as Judge Wilson's secretary. Ms. Shipley testified that she took her mother to Attorney Greer's office in September of 2000 so her mother could give Attorney Greer her handwritten will to be typed up. Ms. Shipley stayed in the room with her mother while her mother spoke to Attorney Greer that day.

Ms. Shipley was asked if she had any knowledge of threats or coercion imposed on her mother with regard to the preparation and execution of the September 28, 2000 deeds, and she stated: "It's on paper. There's all kinds of coercion and undue influence and duress." Ms. Shipley admitted, not surprisingly, that she is not challenging the validity of her mother's Last Will and Testament, which also was executed on September 28, 2000. Ms. Shipley agreed that she believes that her mother made and executed the Last Will and Testament of her own free will.

Joseph W. Austin, Jr., M.D., plaintiff Kathy Austin's husband, testified that he and his wife have been married for 32 years. Dr. Austin was asked if Dixie Wilds was able to manage her own affairs when her husband died in 2000, and he stated: "I think she was competent. She was under a lot of stress, but competent, I think."

The Honorable Ronnie Greer testified by deposition introduced as an exhibit at trial.[4] Attorney Greer produced copies of files he created when he represented various members of the Wilds family. These files included deeds he prepared and the Last Will and Testament of Dixie Wilds, which he also prepared.

---

[4]At the time of the execution of the September 28, 2000 deeds, Judge Greer was a practicing attorney in Greeneville. He subsequently was appointed to his position as a Federal District Judge. We refer in this Opinion to Judge Greer as Attorney Greer simply to reflect the role he played as an attorney representing parties involved in the transactions at issue in this case.

Attorney Greer prepared a Warranty Deed dated September 28, 2000 in which defendant Jacob Wilds, Jr. and Dixie Wilds granted real property to defendant James Wilds. Attorney Greer also prepared a Warranty Deed dated September 28, 2000 from defendant James Wilds and Dixie Wilds to defendant Jacob Wilds, Jr. Attorney Greer testified that it was his understanding that he was preparing the deeds "to divide this property that's described in this 1975 Deed, which had been transferred jointly to James and Jacob Wilds."

Attorney Greer also prepared a deed dated September 28, 2000 from defendant James Wilds to Dixie Wilds. He testified that this deed from defendant James Wilds to Dixie Wilds contains a reference to water rights, which states:

> There is also conveyed herewith to grantee the right to use and maintain the spring, pump house, and existing water lines located on the property of grantor identified as Tract Number 3 as shown on subdivision plat prepared by Professional Surveying Service, Inc. dated April 28, 1999, Parenthetical Drawing Number 99115SUB.DWG. This grant is personal to grantee and shall not run with the land.

Attorney Greer was asked who requested the language in the deed regarding water rights and he stated:

> My recollection on this is that the person who first discussed this with me was James Wilds because I remember this. I don't have a clear memory of all of these events, but I do remember the subject of these water lines because I was very concerned that the effect of these deeds would be to leave this tract of property without any, without any water. And I expressed that to, I'm almost certain it was James Wilds.

Attorney Greer further stated:

> My concern was with there being water that would stay with that tract of land, and I remember comparing that to a situation where you land locked a piece of land and basically destroyed the value of it because there was no, no water on it. And I think I may have mentioned this when you and I have talked before. I have some recollection of somebody telling me that there was another source of water, but I don't know exactly who told me that.

Attorney Greer was asked if he spoke to Dixie Wilds about the situation, and he testified that since Dixie Wilds did not sign this deed, he probably did not discuss the water rights with her.

Attorney Greer was asked if Dixie Wilds was lucid and "able to understand what it was you were doing for her" when he met with her, and he testified that she was. He pointed out that he prepared Dixie Wilds's Last Will and Testament at the same time and stated that he "would not have allowed her to sign that will if I had some question about her competency." Dixie Wilds did not appear to be under any undue influence or duress when she was in Attorney Greer's office. Attorney Greer stated: "She was not upset. She didn't exhibit any unusual behavior. She clearly relied on her sons to a large extent. But, no, there was nothing unusual about that."

Attorney Greer testified that in his files he also had a copy of the "same Deed that I prepared for James Wilds except that it's notarized by somebody named Jill Hartman, not by me. The one I had in my file was notarized by me." Attorney Greer testified that other than the notarization and the recording information, which does not appear on the copy in Attorney Greer's file, the copy of the deed notarized by Jill Hartman "appears to be the same," as the copy of the deed in his file, which he prepared.

After trial the Trial Court entered its order on June 28, 2012 rendering judgment in favor of Defendants after finding and holding, *inter alia*:

> During their lifetime, Jacob and Dixie Wilds acquired a tract of land which this Court will refer to as the farm. For purposes of these findings, the farm was divided into tracts 1, 2, and 3. Tract 3 is separated from the other two tracts by the Houston Valley Road. Originally Jacob and Dixie Wilds lived on tract 3. Located on this tract was a spring and well that provided water for the home. At some later date, Jacob and Dixie Wilds built a white two story home on the other side of Houston Valley Road. This home became the family home place. . . .
>
> In 1975, Jacob and Dixie Wilds executed deeds wherein they conveyed all the property of the farm to their sons as tenants in common. The 1975 deed excepted approximately 1.6 acres and also reserved a life estate in the farm for Jacob and Dixie Wilds. . . .
>
> At all times after Dixie and Jacob moved to the home place, water was supplied from the well and spring located across the Houston Valley Road. . . . While the sons continued the farming operation, the Plaintiffs married and established families and homes in Greene County.
>
> Dixie Wilds had prepared a handwritten document purporting to dispose of her property at death. In September 2000, Ms. Shipley carried her mother

to the law office of Mr. Ronnie Greer, an attorney in Greene County. Mr. Greer was to prepare a will for Dixie Wilds using the handwritten document that she had previously prepared. While in the office, Ms. Shipley heard Mr. Greer mention that he was also "preparing deeds for the boys." The Defendants had decided that they would divide the farm into various tracts between themselves. Consequently, they made arrangements for a survey of the property to accomplish this division. Instead of sharing the entire tract as tenants in common, these tracts would establish fee ownership of the farm to the brothers pursuant to the survey. As part of the division, James Wilds was to receive that portion of the property that contained the well and spring.

On September 28, the defendants came to the office of Mr. Greer with their mother. Ms. Wilds executed the will that Mr. Greer had prepared for her. Article 11 of the will bequeathed to the Plaintiffs the two story white home place. . . . Also, on September 28, various deeds were executed to accomplish the division of the farm between the brothers. James Wilds and Dixie Wilds executed a deed to transfer to Jacob Wilds, Jr. tracts 1 and 2. . . . Jacob Wilds, Jr. and Dixie Wilds then executed a deed to James Wilds for the tract of land known as tract 3 which included the property whereon the spring and well were located. After that deed was executed, James Wilds executed a deed to Dixie Wilds conveying approximately 0.85 acres in fee to the home place. Included in this deed was the right of Dixie Wilds to use and maintain the spring and well. However, the grant was personal and did not run with the land. The end result of these deeds was to (1) divest Dixie Wilds of any life estate that she had in the farm; (2) establish ownership in fee between the brothers; (3) divest Dixie Wilds of any interest she might have of the garden plot; and (4) restrict the use of the spring and well to the lifetime of Dixie Wilds for the home place. The Plaintiffs were not aware of these conveyances.

* * *

Dixie Wilds died in 2009. . . . Shortly after their mother's death, the Plaintiffs were advised by the Defendants that the water to the home place would no longer be available. In order to use the home, the Plaintiffs testified that they had to bring bottled water to the home and also bring buckets of water in order to shower and flush the toilets. Consequently, the Plaintiffs filed this action to set aside these conveyances on the basis of undue influence.

There is no issue in this matter as to the competency of Ms. Wilds to execute the deeds. Mr. Greer in his deposition testified that as far as he could

recall, Ms. Wilds was lucid and able to understand what she was doing. He would not have allowed her to sign the will if he had some question about her competency. The issue of the water rights, however, were a concern for Mr. Greer. He testified that the effect of the deeds would be to leave the home place tract without any water. He testified that he expressed this concern to James Wilds. However, Mr. Greer testified that Ms. Wilds did not exhibit any appearance of being under any influence.

* * *

There are indeed some very suspicious circumstances surrounding the execution of the deeds. It is manifest by virtue of her last will and testament that Ms. Dixie Wilds desired to leave the home place to the Plaintiffs. The abandonment of water rights would render the property virtually useless and has no logical underpinnings. It is also uncontradicted that no consideration for the deeds was exchanged contemporaneously with their executions. The consideration, if any, was paid years before in the form of a loan or loans for which there is no documentary evidence. . . . The sisters were unaware of these deeds until after their mother's death. However, it was clearly Jacob and Dixie Wilds['s] intention that the farm be allocated to the Defendants as evidenced by the 1975 deed to them which retained only a life estate for themselves.

There is no evidence to suggest that the financial affairs of Ms. Dixie Wilds was [sic] exclusively controlled by the Defendants. It is further evident that from the execution of these deeds until her death, the Plaintiffs continued to visit with the mother and were in no way hindered from any interaction with her. There is no evidence to suggest that Ms. Wilds was experiencing any mental or physical decline. To the contrary, Mr. Greer opined that she was competent. There is no indication that Ms. Wilds indicated to the Plaintiffs that she had executed documents that she did not intend to execute nor understand. More important, there is nothing in the record to indicate that Ms. Wilds was the weaker personality that her sons were able to dominate.

It is clear that the action of the Defendants to suddenly inform the sisters that water would not be available was malicious, vindictive, petty and spiteful. This behavior is all too common in families after their parents are deceased. For whatever reason, be it jealousy, greed or plain meanness, the Defendants decided to cut off the water rights to the home place. However, this Court concludes that the Plaintiffs have not established by a

preponderance of the evidence that a confidential relationship existed between the Defendants and Ms. Wilds and that as a result of that relationship these deeds were procured through undue influence.

Plaintiffs filed a motion for additional findings of fact and to alter or amend. After a hearing the Trial Court allowed the evidence to be supplemented with the affidavit of Michael Grigsby, which states that Mr. Grigsby "prepared the survey dated April 21, 2000 on the property of Jacob and Dixie Wilds and the boundary lines between their property and James Wilds's property," and that Mr. Grigsby recalled "being contacted by James Wilds to obtain the survey . . .," and further recalled "James Wilds being present and designating the boundary line as indicated on the survey with five new set points." The Trial Court declined to make any additional findings and denied Plaintiffs' motion to alter or amend. Plaintiffs appeal to this Court.

## Discussion

Although not stated exactly as such, Plaintiffs raise three issues on appeal: 1) whether the Trial Court erred in refusing to consider evidence given in the testimony of Attorney Greer and Defendants; 2) whether the Trial Court erred in denying Plaintiffs' motion to make additional findings or to alter or amend; and 3) whether the Trial Court erred in failing to determine the amount of Plaintiffs' loss of use of the property inherited from their mother.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first consider whether the Trial Court erred in refusing to consider evidence given in the testimony of Attorney Greer and Defendants. In their brief on appeal Plaintiffs argue that the Trial Court erred when it refused to consider relevant evidence offered by Attorney Greer and Defendants. Plaintiffs are mistaken. The evidence discussed by Plaintiffs in their brief on appeal was considered by the Trial Court as evidenced by the Trial Court's detailed findings in its June 28, 2012 order. Plaintiffs, in their brief on appeal, point to no evidence which was ignored. Instead, what Plaintiffs want this Court to do is to review this same evidence and reach a different conclusion. This we decline to do. Plaintiffs argue that the Trial Court should have reviewed the evidence and "should have found a confidential relationship and undue influence." The real issue here is whether the Trial Court erred in

finding that Plaintiffs failed to prove a confidential relationship necessary to support a finding of undue influence.

In *Estate of Price* this Court explained:

Courts apply the doctrine of undue influence "when one party, such as a grantee, is in a position to exercise undue influence over the mind and the will of another, such as a grantor, due to the existence of a confidential relationship." *Brown v. Weik*, 725 S.W.2d 938, 945 (Tenn. Ct. App. 1983). In *Iacometti v. Frassinelli*, we discussed the nature of a confidential relationship as follows:

It is that relationship where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with the ability, because of that confidence, to influence and exercise dominion over the weaker or dominated party, such as nurse and invalid, trusted business adviser and friend etc. *Bayliss v. Williams* (1869) 6 Cold. 440, 46 Tenn. 440; *Miller v. Proctor*, [24 Tenn. App. 439, 145 S.W.2d 807], *supra*. Proof of the existence of the normal family relationship between a parent and adult child, standing alone, does not give rise to an inference or presumption that either one exercises any dominion and control over the other.

*Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973). A trial court's conclusions regarding whether a confidential relationship existed or a person exercised undue influence over another are questions of fact. *Gibson v. Gibson*, No. W2004-00005-COA-R3-CV, 2004 WL 2464271, at *3 (Tenn. Ct. App. W.S., Nov. 2, 2004).

In Tennessee, a presumption of undue influence arises when there is a confidential relationship followed by a transaction in which the dominant party receives a benefit from the other party. *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995). The burden of proof for these elements rests with the party who alleges the confidential relationship. *Smith v. Smith*, 102 S.W.3d 648, 653 (Tenn. Ct. App. 2002). However, once that party establishes a presumption of undue influence, the burden of proof shifts to the dominant party to rebut the presumption by clear and convincing evidence of the fairness of the transaction. *Id.*

*In re: Estate of Price*, 273 S.W.3d 113, 125 (Tenn. Ct. App. 2008).

In the case now before us, the Trial Court specifically found:

> There is no evidence to suggest that the financial affairs of Ms. Dixie Wilds was [sic] exclusively controlled by the Defendants. It is further evident that from the execution of these deeds until her death, the Plaintiffs continued to visit with the mother and were in no way hindered from any interaction with her. There is no evidence to suggest that Ms. Wilds was experiencing any mental or physical decline. To the contrary, Mr. Greer opined that she was competent. There is no indication that Ms. Wilds indicated to the Plaintiffs that she had executed documents that she did not intend to execute nor understand. More important, there is nothing in the record to indicate that Ms. Wilds was the weaker personality that her sons were able to dominate.

> * * *

> However, this Court concludes that the Plaintiffs have not established by a preponderance of the evidence that a confidential relationship existed between the Defendants and Ms. Wilds and that as a result of that relationship these deeds were procured through undue influence.

A careful and thorough review of the record on appeal reveals that the evidence does not preponderate against the Trial Court's finding that Plaintiffs failed to prove that a confidential relationship existed between Dixie Wilds and either of the defendants. The evidence, in fact, shows that Dixie Wilds was competent to handle her own affairs and that she did so. The evidence supports a finding of a normal parent and adult child relationship between Dixie Wilds and each of the defendants, but such a relationship does not give rise to a presumption of dominion and control.

In their brief on appeal Plaintiffs point out that Dixie Wilds was "left with no property," at one point during the pendency of the transaction that occurred on September 28, 2000 and, therefore, "[b]ecause James Wilds was under no obligation to transfer the property back to Ms. Wilds, James Wilds was able to exercise dominion and control over Ms. Wilds taking some of her land and modifying her access to water." Plaintiffs assert that this proves a confidential relationship wherein James Wilds was able to exercise dominion and control over Dixie Wilds. We, as did the Trial Court, disagree.

The fact that Dixie Wilds may have been in a position wherein she very briefly did not own any of the land during the pendency of the transaction which occurred on

-12-

September 28, 2000 does not show that Dixie Wilds *entered* into the transaction as a result of undue influence or duress. Rather, the facts and circumstances in this case show that all three of the September 28, 2000 deeds were prepared ahead of time by Attorney Greer, and that all three were executed on the same day, at the same time, at the same place. The evidence shows that Dixie Wilds and both Defendants were at Attorney Greer's office together when the deeds were executed. Therefore, the fragile position that Plaintiffs seek to have this Court find Dixie Wilds to have been in, occurred very briefly in the midst of the transaction and not before the transaction, and simply does not show that Dixie Wilds and Defendants had a confidential relationship that allowed Defendants to exercise undue influence or duress over Dixie Wilds.

We understand, as did the Trial Court, why Plaintiffs are unhappy with Defendants. But the reality is that Plaintiffs, as found by the Trial Court, failed to carry their burden to show that Dixie Wilds had a confidential relationship with either of the defendants necessary to give rise to a presumption of undue influence.

We next consider whether the Trial Court erred in denying Plaintiffs' motion to make additional findings or to alter or amend. Plaintiffs argue in their brief on appeal that the Trial Court erred in refusing to make additional findings. As discussed above, however, the Trial Court did not ignore the evidence which Plaintiffs assert support additional findings, but only declined the request to make additional findings to its already detailed and specific findings. This argument is without merit.

As for Plaintiffs' motion to alter or amend, we review a trial court's ruling on a Tenn. R. Civ. P. 59.04 motion to alter or amend a judgment using the abuse of discretion standard. *Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003); *Linkous v. Lane*, 276 S.W.3d 917, 924 (Tenn. Ct. App. 2008). As noted by our Supreme Court:

> An abuse of discretion is found only when a trial court has "'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002) (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)). The abuse of discretion standard does not permit an appellate court to merely substitute its judgment for that of the trial court. *See Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001).

*Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003). *See also Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) ("Under the abuse of discretion standard, a trial court's ruling

'will be upheld so long as reasonable minds can disagree as to propriety of the decision made.'")(quoting *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000)).[5]

Plaintiffs' motion to alter or amend is based upon Plaintiffs' assertion that if the Trial Court made the additional findings as requested by Plaintiffs, then the Trial Court should grant Plaintiffs' motion and find that the September 28, 2000 deeds were the product of undue influence because of a confidential relationship. As discussed fully above, however, the Trial Court found that Plaintiffs had failed to prove a confidential relationship between Dixie Wilds and either of the defendants. The evidence in the record on appeal does not preponderate against this finding. Furthermore, as discussed more fully above, the evidence in the record on appeal preponderates against the additional findings requested by Plaintiffs, and we have found no error in the Trial Court's declining to make additional findings. As such we find no abuse of discretion in the Trial Court's denial of Plaintiffs' motion to alter or amend.

Our resolution of Plaintiffs' first two issues renders moot Plaintiffs' issue regarding whether the Trial Court erred in failing to determine the amount of Plaintiffs' loss of use of the property inherited from their mother.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellants, Kathy Austin, Vickie Shipley, and Sherry Foshie, and their surety.

_____
D. MICHAEL SWINEY, JUDGE

---

[5] We likewise review a trial court's ruling on a Tenn. R. Civ. P. 60.02 motion for relief from a final judgment using the abuse of discretion standard. *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003). The abuse of discretion standard also is applied under Rule 54.02. *See Harris v. Chern* 33 S.W.3d 741, 746 (Tenn. 2000) ("A trial court's ruling on a motion to revise pursuant to Rule 54.02 will be overturned only when the trial court has abused its discretion. *See Donnelly v. Walter*, 959 S.W.2d 166, 168 (Tenn. Ct. App. 1997).").